OBERLY and others *vs.* LERCH and others.*

1. The surplus of the proceeds of lands of a decedent, sold by order of the Orphans Court for the payment of his debts, above the amount needed for the payment of debts, retains the character of real estate, and upon the death of the person entitled thereto, will pass by succession, as real estate. So also will the proceeds of lands sold by order of a court on proceedings for partition, because incapable of partition.

2. Such proceeds retain their character of real estate for the purposes of succession until they vest in some person who is not an infant or lunatic, and who has capacity to change the nature of the estate, and who by accepting it as money, or by some act recognizing it as personal estate, gives it the character of personalty.

3. The income from lands, and the interest on the proceeds of the sale of lands, are personal estate, and will, upon the death of an infant to whom they belong, be transmitted as such, while the lands, and the proceeds of their sale, pass as real estate.

4. When lands of an infant in another state are sold by partition proceedings there, if by the law of that state the proceeds are to be considered personal estate, and to be transmitted as such, they will pass as such in this state, although they are, at the death of the infant, in the hands of the guardian appointed in this state, and the infant is a resident of this state.

This cause was argued on a motion to dissolve the injunction, and to dismiss the bill.

*Mr. Shipman* and *Mr. Vanatta,* in support of the motion.

*Mr. E. T. Green* and *Mr. J. Wilson,* contra.

THE CHANCELLOR.

Owen Oberly, of Warren county, died on the first day of September, 1852, intestate, seized of a valuable farm in that county, leaving a widow, the defendant, Anna Maria Lerch, who afterwards was married to the defendant, Benjamin F. Lerch, and one child, Emma Oberly, an infant three weeks old. His personal estate was not sufficient to pay his debts. Administration of his estate had been granted to his widow,

---

* CITED *in Wurts' Ex'rs* v. *Page,* 4 *C. E. Gr.* 375; *Cook's Ex'r* v. *Cook's Adm'r,* 5 *C. E. Gr.* 377.

and upon application by her and the defendant, Benjaman F. Lerch, who after the intermarriage had been joined with her in the administration, the Orphans Court of Warren county, in April, 1853, made an order for the sale of the farm to pay debts of the intestate to the amount of $3818.87. On the fourth of September, in that year, the farm was sold for $12,876.49, including the widow's right of dower. Of this sum, one third was invested on mortgage for the life of the defendant, Anna Maria; and of the residue, there remained on the settlement of the final account, on the sixth of April, 1859, $5794.41 above debts and expenses. This balance was paid unto Charles Oberly, one of the complainants, who had been duly appointed guardian of the infant, Emma Oberly.

In 1861, Charles Oberly, as such guardian, received $389.59, the infant's share of that part of the proceeds of the lands of her paternal grandfather, John Oberly, situate in the county of Warren, sold in 1834 by a partition sale, which had been invested for the dower of her grandmother, Catharine Oberly, who died in 1860; and also, $1691.47, her share of proceeds of lands of the same grandfather, situate in Pennsylvania, sold about the same time, on like proceedings, and which had been invested for the same purpose.

The infant, Emma Oberly, died on the second of April, 1865, aged twelve years, leaving the complainants, Charles Oberly, John F. Oberly, and Robert Oberly, her paternal uncles, and the complainant, Emma Baker, the daughter of her deceased paternal aunt, her only heirs-at-law, besides her mother, who inherited for her life; and leaving her mother and three infant children of her mother by the second marriage, her next of kin.

In 1865, after the death of Emma, the complainant, Charles Oberly, as her guardian, settled his account in the Orphans Court of Warren county, upon which the balance was $9464.74.

In September, 1865, administration of the estate of Emma Oberly was committed by the surrogate of Warren county to the defendants, Benjamin F. Lerch, Anna Maria Lerch, and

Jehiel T. Kern, who thereupon sued the complainant, Charles Oberly, the late guardian, in the Supreme Court of this state, for the whole balance in his hands.

The bill in this court is filed to enjoin that suit. The complainants claim that so much of that balance as is made up of the proceeds of real estate, must be considered as real estate, and descend as such ; that the administrators of Emma are not entitled to receive it, but that it belongs to them as her heirs-at-law, subject to the life estate of her mother ; and that they are entitled to have it invested and secured under the direction of this court.

If the complainants are right in their claim, the case is a proper subject of equity jurisdiction. The proceeds of the real estate must be separated from the rents of the farm and the interest of these proceeds, which are personal estate and form part of the balance in the hands of the guardian, and when separated, must be invested for the life of the mother.

The main, if not the only question in the case is, whether the surplus of the proceeds of lands of a decedent, sold by direction of a court for the payment of his debts, which remains after payment of the debts, or the proceeds of lands sold on proceedings in partition because they cannot be divided, when such surplus or proceeds belong to an infant, are upon the death of the infant, to be considered as real estate or as personal estate, for the purposes of succession.

There is nothing in the statutes by which these sales are authorized, to settle the question. The partition act says the proceeds shall be paid " to the parties interested in the real estate so sold, their guardians, or legal representatives, in proportion to their respective rights in the same ; " and the act authorizing lands to be sold for debts, directs that " the surplus money arising from such sale shall be distributed among the heirs or devisees, according to the law of descents in the former, and the will of the testator in the latter case." But this, while it *seems* to regard it as real property, does not give any character to it to guide its transmission after its being converted into money. The disposition of the surplus must have been the same, without this provision. In

such cases, by the descent or devise, the land had vested in the heir or devisee, subject to the lien for debts, and all beyond that lien would, by settled principles of law, have belonged to the owner of the property before the sale. The provision may show, by the superabundant care in inserting it, that the legislature was very careful not to disturb by a sale the transmission of the proceeds as real estate.

The general rule is, that property is transmitted as real or personal, according to the form in which it exists at the death of the owner. But courts of equity, by the doctrine of equitable conversion, now well established, hold that in certain cases, property actually existing in one form shall, for transmission, be held to be in the other. This doctrine of notional conversion, as it has been termed, is applied in cases where, by a will or marriage settlement, money is directed to be laid out in land, or land converted into money, to carry out the object of the will or settlement. In such case, it is considered in equity to be the kind of property into which it is directed to be converted, from the time the change should have taken place, whether such conversion is actually made or not; and this theoretical conversion is considered in equity to continue until the ownership vests in some person who would have the right to convert it from one kind to the other, and who, when of legal capacity, accepts it, or does something to recognize it or give it character in the shape in which it exists. Until this is done, it must retain the character of real or personal impressed upon it by the last absolute owner who had such power over it. *Fletcher* v. *Ashburner*, 1 *Lead. Cas. in Eq.* [671]; *Wheldale* v. *Partridge*, 8 *Ves.* 235; *Craig* v. *Leslie*, 3 *Wheat.* 563; *Sweezy* v. *Frazer*, 1 *Duer* 301 *and* 306.

An infant or lunatic cannot elect, and therefore cannot change the character impressed upon the property. *Leigh & Dalzell on Equit. Conv.* 182; *Seeley* v. *Jago*, 1 *P. W.* 389; *Notes to Fletcher* v. *Ashburner*, 1 *Lead. Cas. in Eq.* [684]; *In re Wharton*, 5 *De G., M. & G.* 33.

The question in this case is, when land is by legal proceed-

ings converted into money for a definite purpose, whether the proceeds are to be considered as converted into money, except for that purpose, and whether they do not for all other purposes retain their character as land. It is contended that on a sale for the payment of debts, the surplus not needed for debts remains real estate, and that on a partition sale the proceeds are personal only for the purpose of division; that for all other purposes they must be considered to remain as real.

The question is not the same as when one species is directed to be converted into the other by a will, or a marriage settlement. Yet it is placed upon the same principle, which is, that property shall retain the character impressed upon it by the last absolute owner, until that character is changed by some one having like power over it.

In this state, there is one case in which this question has been brought up for decision; the case of *Snowhill* v. *Snowhill*, in 2 *Green's C. R.* 20. In that case, the lands of an infant had been sold by virtue of a special act of the legislature; the act authorized the sale, and directed the proceeds to be invested, and one-third of the interest to be for the use of the mother of the infant, and two-thirds for the use of the infant, and gave no directions as to the principal. The infant died under age, without issue, and his mother obtained administration of his estate. The bill was filed against the administratrix by his heirs-at-law, who claimed that the proceeds retained the character of real estate, and descended to them as such. This brought up the precise question that we are considering here. Chancellor Vroom, in a well considered opinion, held that the doctrine of equitable conversion only applied in cases of fraud or breach of duty; but where property was *lawfully* changed in character by the legislature, that the heir or next of kin must take it as it actually exists, and that the proceeds of sale in that case must pass as personal property; and he dismissed the bill. On appeal to the Court of Errors, this judgment was reversed. The decision in that court is not reported, but the result

appears in a subsequent proceeding in the same case, in this court, reported in 1 *Green's C. R.* 30. There Chancellor Pennington gives effect to the decision of the Court of Errors as establishing the right of the heir-at-law to the proceeds of the sale.

This decision upon the very point, by the highest court in the state, should be considered as putting the question at rest. But it is contended that the decision is against the clear weight of authority, and as no opinion was delivered, and no principle was settled by the Court of Errors, that the utmost extent to which it should be held binding, is in cases like that in which it was made, that is, sales by virtue of a special statute. This, perhaps, might be a correct view, if the decision was against a well established principle, or against a series of well considered cases, uniform or nearly uniform in their rulings. Or, there may be cases in which it might be wise to bring up for consideration an opinion of that court, when it seems to be made without due and full consideration of the principles that should have guided it.

But on this point, the decisions in courts that ought to have weight here, are very conflicting and apparently irreconcilable. Most of the decisions in England, referred to on the argument, have no real bearing on the point. The case of *Ackroyd* v. *Smithson*, reported in 1 *Bro. C. C.* 503, and in 1 *Lead. Cas. in Eq.* [690], with the full and learned notes of the English and American editors, does not decide the point. That case contains the very able argument of Mr. Scott, afterwards Lord Eldon, which induced Lord Thurlow to decide for him, against his preconceived opinion, so fixed that he at first declined to hear the adverse counsel. But it only decides that when a testator had ordered his land to be sold and converted into money to pay certain legacies, two of which had lapsed by death in his lifetime, that the amount of these lapsed legacies descended to the heir as real estate. The cases of *Wright* v. *Wright*, 16 *Ves.* 188; *Hewitt* v. *Wright*, 1 *Bro. C. C.* 86; *Smith* v. *Claxton*, 4 *Madd.* 484; *Dixon* v. *Dawson*, 2 *Sim. & Stu.* 327, and *Jessopp* v. *Watson*,

1 *Mylne & K.* 665, decide the same point; but they hold further that it goes to the heir, and is held by him as personal estate. That it should go to him as if real estate, does not affect the present question; the property existed in land at testator's death, and as his intention of disposing of it failed by the lapse, the land, or the interest in it, undisposed of, descended to the heir at the testator's death; and when the land was sold, the proceeds belonged to the heir. Holding that these proceeds, when in the hands of the heir, were personal estate, seems at first to be more directly on the point, as it settles the continuance of the character of the property. But in all these cases, the testator, the last absolute owner, had directed a conversion out and out, of the property; he had the power to change and did change its character; he failed to dispose of it, and before it was changed, either actually or by the theory of equitable conversion, the title vested in the heir; and necessarily it vested in him as money, the character so fixed.

There are many other cases in which the proceeds of lands directed out and out to be converted into money, have been held, for want of any valid disposition of them by the testator, to go to the heir. *Collins* v. *Wakeman,* 2 *Ves.* 683; *Fitch* v. *Weber,* 6 *Hare* 145; *Robinson* v. *London Hospital,* 10 *Hare* 19; *Shallcross* v. *Wright,* 12 *Beav.* 505; *Gordon* v. *Atkinson,* 1 *De G. & Smale* 478; *Taylor* v. *Taylor,* 3 *De G., M. & G.* 190.

But all the effect these cases have here is, that they show the leaning of the English courts is in favor of the heir, and that he is not to be disinherited except by a valid and express disposition of the estate.

The case of *Oxenden* v. *Lord Compton,* 2 *Ves.* 70, is more in point. There, the proceeds of timber cut on a lunatic's estate were held at his death to pass as personal property. And Lord Chancellor Loughborough remarks that there is no "equity between the real and personal representatives. Both are volunteers. Each must take what they find at the death of the person entitled for life, in the condi-

tion in which they find it." And he holds that the court, in administering the estate of a lunatic, will not regard the interest either of the heirs or the next of kin, but only that of the lunatic. The force of this case is, perhaps, somewhat affected by the fact which appears by the case, that the timber cut was in a state that required it to be cut for the benefit of the estate, and that the cutting was only taking the produce of the estate in the usual way, and therefore, the proceeds were at all events personal estate.

The case of *Flanagan* v. *Flanagan*, as stated by Sir Thomas Sewell, Master of the Rolls, in his masterly opinion in *Fletcher* v. *Ashburner*, 1 *Bro. C. C.* 497, is an authority in favor of the proceeds of lands unnecessarily sold, being considered for transmission, as personal estate. And its effect is not explained away by Mr. Scott, in his remarks upon it in *Ackroyd* v. *Smithson.*

The case of *Cooke* v. *Dealey*, 22 *Beav.* 196, decided by Sir John Romilly, Master of the Rolls, is much like the present. The real estate of the decedent had been sold by order of the court, for payment of debts and legacies. More was raised by the sale than was needed. The devisee died after the sale. The suit was between her administrator and her heir; and the sole question was whether at her death it passed as real or personal estate. It was held that it passed to the heir as real estate. Sir John Romilly remarks: " More of the real estate was sold than was necessary; of course the conversion is complete to the extent to which the purchase money was required for the particular object for which the sale took place, namely, for the payment of debts and costs, but the excess, though in the *form* of money, remained as before, impressed with the *character* of land."

In the *Matter of Wharton*, a lunatic, 5 *De G., McN. & G.* 33, the real estate of a lunatic had been sold by order of the court, by virtue of the *Stat.* 11 *Geo. IV*, and 1 *Will. IV*, which enacts that the proceeds of the estate sold "shall be of the same nature and character as the estate sold." The sale was in 1829. Wharton, the lunatic, died in 1841, leav-

ing an heir who was also a lunatic incapable of electing, and who died in 1842, intestate, and without having received the money. It was held by the Lords Justices, that at the death of the lunatic's heir, it passed as real estate to his heir-at-law, and not to his next of kin. The statute controlled the first transmission; the second was upon the principle, that money impressed with the character of land remains such until it is accepted as money by its absolute owner, of sufficient capacity to make such election.

In the state of New York, the case of *Bogert* v. *Furman,* 10 *Paige* 496, is like the present. It was as to the surplus moneys, arising from the sale of lands to satisfy a mortgage. One of the owners of the equity of redemption died after the foreclosure and sale, but before the surplus was distributed. It was held by Chancellor Walworth, that this surplus was personal estate, and went as such to the next of kin. The principles contained in the cases on the subject were not discussed at the bar, nor do they appear to have been investigated or considered by the Chancellor. The decision has, however, the authority of this eminent jurist.

In the case of *Graham* v. *Dickinson,* 3 *Barb. C. R.* 170, lands of the testator had been sold to pay his debts. Subsequently, personal estate of the testator was realized from claims against the French government, sufficient to liquidate these debts. It was held that the devisees, whose lands had been sold to pay debts, were entitled to be reimbursed out of the personal estate so recovered, that being the fund primarily liable to debts; but that in case of devisees who died before the recovery, their claim against that fund was personal estate, and went to the next of kin. This case decides nothing that bears upon the point in question. The claim of the devisee at his death was a chose in action, a mere personalty. It was not to the proceeds of the sale of real estate; but a mere right of action, growing out of a maladministration of the estate. But in the opinion of Vice Chancellor Hoffman, he says, that the surplus of a sale of mortgaged premises made in the lifetime of the mortgagor is personal estate, but

Oberly v. Lerch.

if made after his death, his devisee would take. "But she would have taken such surplus as money, not as land. And the devolution from her would be altered accordingly." This seems to conflict with his subsequent opinion in *Sweezy* v. *Thayer*. In that case, reported in 1 *Duer* 286, it is expressly held that the surplus of the sale of mortgaged lands, under a decree of foreclosure, where the equity of redemption at the time of the sale belonged to a minor, who subsequently died under age, was to be deemed real estate, and at his death would go to his heirs, and not to his next of kin. The referee, Murray Hoffman, and the Superior Court, by Justice Bosworth, in very able and well considered opinions in which the cases are reviewed, agree in this result.

In Massachusetts, in *Emerson* v. *Cutler*, 14 *Pick.* 108, it was held, in an opinion delivered by Chief Justice Shaw, that the overplus of the proceeds of the land of an infant, sold by license of the court for the benefit of the infant, at her death under age, was personal estate, and passed to her administrator. This case differs somewhat from that under consideration; as in it, the land was sold for the very purpose of converting it into personalty for the benefit of the infant. It was not a dispute as to a surplus above the purpose for which the land was sold.

The case of *Merick* v. *Bavier*, 6 *Ired. Eq. Rep.* 524, was like the present as to the surplus proceeds of lands sold by order of a court to pay debts. The sale was in the lifetime of the infant heir, who died under age. The court held that the land was converted into money, only to the extent of the object of the sale, the payment of debts; and that the surplus remained real estate, and at the infant's death descended to her heirs.

In Pennsylvania, the decisions conflict. In *Grider* v. *M'Clay*, 11 *S. & R.* 224, decided in 1824, it was held, in an elaborate and well considered opinion delivered by Chief Justice Tilghman, that the surplus of lands sold for debts of the ancestor in the lifetime of an infant heir who died under

age, at the death of the infant, was personal estate, and went to the next of kin.

The decision in *Dyer* v. *Cornell*, 4 *Barr* 359, made in 1846, approves of that in *Grider* v. *M'Clay*, and holds that the proceeds of an infant's lands, sold by its guardian, are personal estate, and on the death of the infant, under age, go to the personal representative. This is the point ruled in *Emerson* v. *Cutler*.

In *Biggert* v. *Biggert*, 7 *Watts* 563, decided in 1838, it is held that a sale in partition proceedings converts lands into money for transmission, at the death of an infant tenant in common.

On the other hand, *In re Tilghman*, 5 *Whart.* 44, decided in 1839, it was held that the proceeds of an infant's lands sold by virtue of an act of the legislature, on the death of the infant under age, remained impressed with the character of real estate, and went as such to her heir-at-law. This case is precisely the same as that of *Snowhill* v. *Snowhill*, and was decided about the same time.

Again, in the case of *Lloyd* v. *Hart*, 2 *Barr* 473, decided in 1846, the question was, as to $3000, the surplus of the proceeds of the lands of a lunatic, sold by order of the court for the payment of his debts. Chief Justice Gibson delivered the opinion of the court, and, on an able discussion of the question, held that this surplus must be considered, at the death of the lunatic, as real estate, and must go to his heirs.

After this review of the authorities, I cannot consider that the decision of the Court of Errors, in *Snowhill* v. *Snowhill*, was against a well settled principle or the decided weight of authorities, and that it should be, therefore, if not disregarded, confined to cases in the precise circumstances of that case. On the contrary, it appears to me that the preponderance of the conflicting authorities is, on the whole, with that decision ; and that the principles and reasoning on which the question ought to be decided, is also with that decision.

It is also in accordance with the spirit of the legislation

of the state in other matters. The provision of the act under which this sale was made, put there for abundant caution, shows that intention. And the provision expressly made in the act authorizing the sales of lands of infants, that the nature of the estate should not be changed by the sale, evinces the same spirit. And while it is the doctrine of this court that the property of an infant or lunatic must be managed for the benefit of the owner only, and not for that of his heirs or next of kin, it is wise to hold that neither shall gain or lose by the change of its character; so that neither class will be tempted to procure a sale when it is not for the owner's benefit, or to defeat it when it would benefit him, as may, in the end, be for their own advantage. Some such persons generally have the management of the infant's estate; and, although the sale is ordered by the court, yet they have it in their power in these *ex parte* applications, so to place the matter before the court as to procure the decision they desire. In this very case the sale was an extraordinary one, and the parties who procured the order appear here to claim the benefit of the change. The rule established in *Snowhill* v. *Snowhill* is based upon high grounds of public policy, and I do not feel inclined to disturb it.

As to the proceeds of the lands in Pennsylvania, they must be governed by the law of that state. Its statute relating to partition proceedings and the money invested for the widow's dower, simply directs "that at her death it shall be paid to the persons legally entitled thereto." *Purdon's Dig. of* 1861, *p.* 298, § 152. And in *Hise* v. *Geiger*, 7 *W. & S.* 273, it was held that it must be paid to the heirs of the intestate, and not to his administrators.

This settles, that if Owen Oberly was living he would be entitled to these proceeds, but does not determine what character they would retain, or to whom they would go at his death. But on the authority of *Biggert* v. *Biggert*, which is upon the proceeds of a partition sale, and, among the conflicting decisions in that state, approaches nearer this case than any other, I will hold that these proceeds, at the death of Owen Oberly, were personal estate, and were transmitted

to, and by his daughter as such, and that they belong to her administrators.

The principal of the proceeds of the sale of lands in Warren county, including the proceeds of lands of John Oberly and the surplus of the sale of lands of Owen Oberly, belong to Anna Maria Lerch, for her life, as heir of her daughter Emma, and must be invested under the order of this court, and the interest thereon, including the interest from the death of Emma, must be paid to her. At her death, the principal, and the principal invested for the dower of Anna Maria Lerch, must be divided equally among the three uncles, and Emma Baker, as the heirs-at-law. The residue of the fund in the hands of Charles Oberly is personal estate, and must be paid to the administrators of Emma Oberly.

The motion must be denied.*

4. A power to sell mortgaged premises for the payment of the mortgage debt, given to the mortgagee by the mortgage, is a valid power. It is liable to great abuse, and the exercise of it will be jealously watched. But sales under it, fairly made, will not be set aside.

---

* Decree affirmed, *post* 575.

